UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
NOEL MITCHELL,

                                        Plaintiff,                    01 CIV. 8557 (GAY)
                                                                      02 CIV. 3658 (GAY)

                    - against -

AMERICA ONLINE, INC.,                                                 **DECISION
                                                                      & ORDER**

                                        Defendant.
----------------------------------------------------------------x

     Plaintiff Noel Mitchell ("plaintiff," "Mitchell") brought this action alleging that

defendant America Online, Inc. ("defendant," "AOL") discriminated against him based

on his race, then retaliated against him for complaining about the alleged discrimination

by terminating his employment.  A jury trial commenced on September 20, 2004, at

which the jury determined that although AOL had not discriminated against Mitchell

based on his race, it had unlawfully retaliated against Mitchell by terminating his

employment with AOL.  The jury awarded Mitchell $29,000 in compensatory damages

and $100,000 in punitive damages.  On September 29, 2004, the Clerk of the Court

entered judgment for Mitchell in the amount of $129,000.

     Presently before this Court are defendant's motion for judgment as a matter of

law pursuant to Fed. R. Civ. P. 50 or, in the alternative, a new trial pursuant to Fed. R.

Civ. P. 59(a), and plaintiff's application for attorney's fees and costs.

**BACKGROUND**

Plaintiff was Acting Supervisor and Inventory Coordinator Specialist for MARS Theater Management Systems, a division of AOL-Moviefone. (T: 33)[1]. Prior to working for MARS, in early 1998, plaintiff completed and received a certificate from Pace University in computer hardware and applications for the office professional. (T: 38). However, at no relevant time did plaintiff possess a bachelor's degree or an advanced degree. (T: 217). He was hired in the spring of 1998 as a temporary "intern clerk" for Moviefone and MARS. (T: 45). After a month or two, plaintiff was given a permanent position as an inventory clerk. (T: 46). In this capacity, he used his computer skills to run the inventory department, which consisted of computer hardware and theater equipment inventory. (T: 46).

In 1999, plaintiff's title changed from 'inventory clerk' to 'inventory coordinator' when America Online acquired Moviefone. (T: 50). During this time, plaintiff also acted in a supervisory capacity at MARS and Moviefone when his supervisor, Seth Seigel-Laddy, was away from the facility. (T: 48). He performed in this supervisory capacity until he was terminated in January 2001. (T: 50). Plaintiff's supervisors were Mr. Seigel-Laddy, on the MARS side, and Philip Talamas, on the Moviefone side. (T: 53-4). Mr. Seigel-Laddy's supervisor was James King. (T: 54).

Mr. Seigel-Laddy informed plaintiff that a position for inventory supervisor was going to open up. (T: 55). Plaintiff testified that Mr. Seigel-Laddy told him that he was guaranteed to get the position. (T: 56). In November 1999, Mr. Seigel-Laddy told

---

[1] The abbreviation "T" followed by a page number indicates the relevant pages of the trial transcript.

plaintiff that he had been approved for the promotion to inventory supervisor. (T: 59). However, when plaintiff spoke with Mr. Seigel-Laddy again in January 2000, he was told that a senior executive had turned down the proposed promotion. (T: 62). After returning from his father's funeral in Jamaica, plaintiff learned that Peter Bury had been hired for the inventory supervisor's position, but as Mr. Bury had no experience, plaintiff had to train him. (T: 72).

At that time, plaintiff spoke with Ralph Rivera, the supervisor of Mr. Talamas and Mr. King, about the failure to promote him to inventory supervisor. (T: 79). Mr. Rivera instructed plaintiff to go to Human Resources and assured plaintiff that "he was going to get to the bottom of it right away." (T: 81).

Mr. Bury resigned suddenly after approximately three weeks as inventory supervisor. (T: 91-2). Mr. Seigel-Laddy mentioned nothing to plaintiff about being considered again for the open position. (T: 92). At a meeting with Mr. Rivera, Mr. King and Mr. Seigel-Laddy, plaintiff was informed about a training program in which he could participate in order to be considered for the inventory supervisor position. (T: 93-4). Plaintiff had previously met with Michelle Roth, the Human Resources manager in the White Plains office, and he had explained the circumstances of losing the promotion, and stated to her that it was "racial profiling." (T: 99, 101). After his meeting with Mr. Rivera, Mr. King and Mr. Seigel-Laddy, plaintiff did not speak to anyone else within the White Plains office regarding the training program. (T: 104).

The training program lasted ninety days. (T: 122). Plaintiff started the program in June 2000. (T: 134). Although he felt that the training program was unfair because the curriculum consisted of tasks he was already performing (T: 136), plaintiff

3

completed it.  (T: 145).  After the first thirty days, plaintiff received an 86% on his evaluation; after the next sixty days, he scored an 87%.  (T: 144, 153).  Plaintiff sent an email to Mr. Rivera, Mr. Talamas, Mr. King and Mr. Seigel-Laddy complaining about the thirty-day review, but he did not mention race.  (T: 190-92).  After the program ended, Mr. Seigel-Laddy told plaintiff that he had to interview, hire and train another inventory coordinator in order to be promoted to inventory supervisor.  (T: 154).  Plaintiff considered this to be unfair because he had already completed the training program and done all that was required of him.  (T: 155).  However, plaintiff never complained to Mr. Rivera, Mr. King or Mr. Seigel-Laddy that the program was unfair because it was based on his race.  (T: 225).

After the training program ended in the fall of 2000, plaintiff hired Byron Boyd via an employment agency to work with him in the inventory department.  (T: 262-63).  In December 2000, plaintiff found out that AOL was going to sell the MARS division.  (T: 159).  At the time, he was the only full-time AOL employee in the MARS Inventory Department.  (T: 159).  At a meeting in December 2000, Mr. Talamas told the employees that because MARS would not be sold until August 2001 at the earliest, the inventory department would be part of the transition of MARS from AOL to the buying company, Radiant.  (T: 163).  Mr. Talamas also created a series of draft organizational charts indicating the changes in MARS that would occur pursuant to its sale to Radiant.  (T: 820-27).  Some of these undated charts contained plaintiff's name (T: 820-21), but some did not (T: 826-27).  At least one of these charts also contained Boyd's name listed under "inventory," while plaintiff's name was absent.  (T: 826).  These organizational charts were not final drafts.  (T: 825).

In a letter dated December 27, 2000, plaintiff wrote a letter to Steve Case, the CEO of AOL at the time, at the Virginia address of corporate headquarters. (T: 163, 172). In this letter, plaintiff explained that he was promised a promotion and did not receive it; he also mentioned his race and called the training program selective and unfair. (T: 165-7). Plaintiff also wrote a letter, dated December 27, 2000, to William Fitzgerald, then the Vice-President of Interactive Service at AOL. (T: 168-69). In this letter, he stated basically the same things that he had written in his letter to Mr. Case. (T: 171). He also stated in these letters that he felt that he was passed over for the promotion to inventory supervisor because of racial discrimination. (T: 172).

Copies of these letters were faxed to Ms. Roth, and in January 2001, she spoke with Mr. Fitzgerald about plaintiff's complaints of racial discrimination. (T: 305). However, she did not recall speaking with anyone in the White Plains office about plaintiff's letters. (T: 306-07). Rather, because Mr. Fitzgerald had told her that he would handle plaintiff's complaints, Ms. Roth did not conduct an investigation into plaintiff's racial discrimination claims. (T: 325, 327).

On January 21, 2001, plaintiff was among a group of employees that was informed that they were being terminated from their position. (T: 172-73). Plainitff stated that Boyd was not terminated, and in fact, was kept on in the inventory department after January 2001. (T: 263). Plaintiff was offered a severance package, and he received a phone call from Mr. Fitzgerald encouraging him to accept the package. (T: 174). Plaintiff stated that there was nothing he wanted to further discuss with Mr. Fitzgerald. (T: 176). When plaintiff was terminated, his salary was $29,000 a year. (T: 180). Although he has since sent out about 25 résumés, he has been

5

unemployed since he was terminated from AOL.  (T: 183).

## DISCUSSION

I.    Standard for Judgment as a Matter of Law

Defendant moves for judgment as a matter of law because the evidence
presented at trial failed to support plaintiff's retaliation claim and the punitive damages
award.  Pursuant to Rule 50 of the Federal Rules of Civil Procedure, "a court should
render judgment as a matter of law when 'a party has been fully heard on an issue and
there is no legally sufficient evidentiary basis for a reasonable jury to find for that party
on that issue.'"  Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 149
(2000), quoting Fed. Rule Civ. Proc. 50(1).

"[I]n entertaining a motion for judgment as a matter of law, the court should
review all of the evidence in the record."  Reeves, 530 U.S. at 151.  "In doing so,
however, the court must draw all reasonable inferences in favor of the nonmoving party,
and it may not make credibility determinations or weigh the evidence."  Id.

"Whether judgment as a matter of law is appropriate in any particular case will
depend on a number of factors.  Those include the strength of the plaintiff's prima facie
case, the probative value of the proof that the employer's explanation is false, and any
other evidence that supports the employer's case and that properly may be considered
on a motion for judgment as a matter of law."  Id., at 148-49.

II.    Standard for Granting a New Trial

In the alternative, defendant also moves for a new trial because the verdict for
plaintiff on his retaliation claim was against the weight of the evidence.  Rule 59 of the

Federal Rules of Civil Procedure provides, in pertinent part:

> A new trial may be granted to ... any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States ....

Rule 59's threshold for granting a new trial is lower than Rule 50's threshold for granting judgment as a matter of law because the trial judge "is free to weigh the evidence himself and need not view it in the light most favorable to the verdict winner." <u>U.S. v. Landau</u>, 155 F.3d 93, 104 (2d Cir. 1998)(internal quotation and citation omitted). Thus, "a motion for a new trial may be granted even if there is substantial evidence to support the jury's verdict." <u>Caruolo v. John Crane, Inc.</u>, 226 F.3d 46, 54 (2d Cir. 2000). However, the trial court "ordinarily should not grant a new trial unless it is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." <u>Hygh v. Jacobs</u>, 961 F.2d 359, 365 (2d Cir. 1992) (internal quotation omitted).

III.    <u>Retaliation</u>

Title VII of the Civil Rights Act of 1964 provides that "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because [the employee] has opposed any practice made an unlawful employment practice by" Title VII, 42 U.S.C. § 2000e-3(a). In order to establish a *prima facie* case of retaliation pursuant to Title VII, a plaintiff must show: "(1) that [he] was engaged in protected activity by opposing a practice made unlawful by Title VII; (2) that the employer was aware of that activity; (3) that [he] suffered adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action." <u>Galdieri-Ambrosini v. National Realty & Dev., Corp.</u>, 136 F.3d 276, 292

(2d Cir. 1998), citing Reed v. A. W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996).

If a plaintiff establishes his *prima facie* case of retaliation, defendant must then offer "a legitimate, non-discriminatory reason for the adverse action." Slattery v. Swiss Reinsurance America Corp., 248 F.3d 87, 95 (2d Cir. 2001). Once defendant proffers this reason, plaintiff must then show that the proffered reason is pretextual. See id.

With regards to the fourth prong of a plaintiff's *prima facie* case of retaliation, "temporal proximity can demonstrate a causal nexus." Id., citing Manoharan v. Columbia Univ., 842 F.2d 590, 593 (2d Cir. 1988). Proof of causation may be shown either: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. Of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

"The lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection." Gordon, 232 F.3d at 117 (emphasis omitted). However, retaliation can be found where the agent denies knowledge of a plaintiff's protected activity, "so long as the jury finds that the *circumstances* evidence knowledge of the protected activities." Gordon, 232 F.3d at 117 (emphasis added). A jury may choose to disbelieve witnesses who deny that events essential to a plaintiff's case occurred, but the plaintiff cannot prevail on this disbelief alone. See Goldhirsh Group, Inc. v. Alpert, 107 F.3d 105, 109 (2d Cir. 1997). "There must be some affirmative evidence that the event occurred." Goldhirsh Group, Inc., 107 F.3d at 109 (internal quotations and citations omitted). "[T]he discredited testimony is not

considered a sufficient basis for drawing a contrary conclusion." Bose Corp. v. Consumers Union of the United States, Inc., 466 U.S. 485, 512 (1984). In other words, "the factfinder must *believe* the plaintiff's explanation of [retaliation]." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 147 (2000) (internal quotations and citations omitted)(emphasis in original).

In addition, a plaintiff "need not disprove a defendant's proffered rationale for its adverse actions." Gordon, 232 F.3d at 117, citing Fields v. NYS Office of Mental Retardation & Development Disabilities, 115 F.3d 116, 120 (2d Cir. 1997). Nevertheless, a plaintiff must prove "by a preponderance of the evidence that the defendant intentionally [] retaliated against the plaintiff for engaging in protected activity." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (internal quotations omitted).

On the other hand, "[w]here timing is the only basis for a claim of retaliation, and the gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." Slattery, 248 F.3d at 95. "Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, thought not yet definitively determined, is no evidence whatever of causality." Clark Cty Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001). Where the record "conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue," an employer is entitled to judgment as a matter of law. Reeves, 530 U.S. at 148.

Here, defendant argues that plaintiff failed to establish a *prima facie* case of retaliation because he failed to show a causal connection. The record indicates that plaintiff adequately established the fourth prong of his *prima facie* case by showing that temporal proximity provided the necessary causal connection. On December 27, 2000, plaintiff penned two letters to Steve Case and William Fitzgerald, both based in the Virginia headquarters of AOL, complaining of racial discrimination with regards to his employment at MARS/AOL. At least one of these letters was faxed back to Michelle Roth, the Human Resources Manager in AOL's White Plains office. Ms. Roth does not recall whether or not she spoke with Mr. Seigel-Laddy and/or Mr. Talamas about these letters. Nevertheless, less than a month later, on January 21, 2001, plaintiff was terminated from his position by Mr. Talamas. This short time period in which the adverse employment action followed plaintiff's protected activity is sufficient temporal proximity to establish a causal connection. See Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002) (one month between the protected activity and the adverse action is "sufficient to establish the required causal link for a *prima facie* case"); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998) (two months between protected activity and adverse action is sufficient to establish causation). Accordingly, plaintiff established his *prima facie* case of retaliation.

Defendant further argues that even if plaintiff established a *prima facie* case of retaliation, he failed to rebut defendant's proffered reason for the elimination of his position. The record indicates otherwise. Ms. Roth testified that she knew as early as October 2000 that plaintiff *might* be fired from his position at AOL. (T: 360-61).

However, the organizational charts created by Mr. Talamas show that at least at some point during the transition planning period, plaintiff was still being considered as an employee to retain, even after the sale of MARS to Radiant. The organizational charts introduced into evidence at trial were not final drafts. In addition, the record reflects that Ms. Roth was uncertain as to whether she told plaintiff's supervisors about his race discrimination complaints. Further, because the charts were undated, the jury was entitled to infer from their existence, in conjunction with the temporal proximity between plaintiff's letters of complaint and his termination, that defendant considered keeping plaintiff as an employee of MARS, then retaliated against him for complaining of racial discrimination.

Moreover, the jury heard evidence that plaintiff had hired a gentleman named Byron Boyd after his participation in the training program in 2000. (T: 262). According to plaintiff's testimony, Mr. Boyd was retained after the termination of plaintiff's inventory position. (T: 263). Mr. Boyd's first name also appears under "inventory" on one of Mr. Talamas's draft organizational charts, labeled "Ops Jan '01," while plaintiff's name is absent. (T: 826). In fact, plaintiff's name is listed on another draft organizational chart, labeled "Ops January '01 changes," as a position to be eliminated. (T: 827). Based upon this testimony, the jury was entitled to infer that someone, namely Byron Boyd, had been retained in the inventory department after plaintiff was terminated from employment, and that the more experienced plaintiff was not retained, in retaliation for his complaints of racial discrimination. Accordingly, as plaintiff has established his retaliation claim with a legally sufficient evidentiary basis, and because the verdict in his favor was not against the weight of the evidence, defendant's motion for judgment as a

matter of law is denied.  The motion for a new trial is also denied.  The verdict was not a

seriously erroneous result or a miscarriage of justice.

IV.    Punitive Damages

"Title VII authorizes punitive damages where "[t]he complaining party

demonstrates that the respondent engaged in a discriminatory practice or discriminatory

practices with malice or with reckless indifference to the federally protected rights of an

aggrieved individual.'" Robinson v. Instructional Sys., Inc., 80 F. Supp.2d 203, 209

(S.D.N.Y. 2000), quoting 42 U.S.C. § 1981a(b)(1).  Further, the United States Supreme

Court determined that Title VII requires plaintiffs to make a further "demonstrat[ion] of

their eligibility for punitive damages."  Kolstad v. American Dental Ass'n., 527 U.S. 526,

534 (1999).  The Court found that "malice" and "reckless indifference" pursuant to Title

VII referred to "[t]he employer's knowledge that it may be acting in violation of federal

law, not its awareness that it is engaging in discrimination."  Kolstad, 527 U.S. at 535.

Thus, an employer must at least discriminate in the face of a perceived risk that its

actions will violate federal law, and "a positive element of conscious wrongdoing is

always required."  Kolstad, 527 U.S. at 538 (internal quotation and citation omitted).

If a plaintiff fails to show that the employer knew of the relevant federal

prohibition, "a plaintiff could satisfy its burden by introducing evidence of outrageous or

egregious behavior of the defendant to support an inference of an 'evil motive.'"

Robinson, 80 F. Supp.2d at 209; see Kolstad, 527 U.S. at 538 ("[e]gregious or

outrageous acts may serve as evidence supporting an inference of the requisite 'evil

motive'.").  However, "an employer may not be vicariously liable for the discriminatory

12

employment decisions of managerial agents where these decisions are contrary to the employer's good faith efforts to comply with Title VII."  Kolstad, 527 U.S. at 545.

Here, plaintiff did not introduce any evidence of 'egregious' or 'outrageous' behavior of defendant to support an inference of an 'evil motive'.  Moreover, contrary to cases where employers "never adopted any anti-discrimination policy [or] provide[d] any training whatsoever on the subject of discrimination," Anderson v. G.D.C., Inc., 281 F.3d 452, 461 (4th Cir. 2002), AOL had implemented a company-wide Equal Employment Opportunity ("EEO") Policy.  This policy was available to all AOL employees, posted in the employee break rooms and on the company website which was accessible by all employees.  (T: 377-81).  AOL also had a grievance policy via which employees could bring complaints of discrimination and other complaints.  (T: 302).  These anti-discrimination efforts by AOL, together with the lack of evidence upon which a reasonable jury could conclude that defendant acted egregiously or outrageously toward plaintiff, preclude the award of punitive damages in this case.  Accordingly, the $100,000 punitive damages award is set aside, as a matter of law.

V.    Attorneys' Fees and Costs

     A.    Prevailing Party

Congress has authorized courts to use their discretion in awarding attorney's fees to prevailing litigants in Title VII cases.  See E.E.O.C. v. Safeguard Chemical Corp., 166 F. Supp.2d 810, 814 (S.D.N.Y. 2001).  Section 706(k) of Title VII of the Civil Rights Act of 1964 provides:

> In any action or proceeding under this subchapter the court, in its
> discretion, may allow the prevailing party ... a reasonable attorney's fee

(including expert fees) as part of the costs ....

42 U.S.C. § 2000e-5(k).  One is a 'prevailing party' "if he 'obtains at least some relief on the merits.'" <u>Knoeffler v. Town of Mamakating</u>, 126 F. Supp.2d 305, 310 (S.D.N.Y. 2000), <u>quoting</u> <u>Farrar v. Hobby</u>, 506 U.S. 103, 111 (1992).  In order to prevail, "'[a] party need not succeed on every issue raised,[], nor even the most crucial one.'" <u>Id.</u>, at 310, <u>quoting</u> <u>LaRouche v. Kezer</u>, 20 F.3d  68, 71 (2d Cir. 1994).  "The party merely has to prevail on a 'significant claim.'" <u>Id.</u>, at 310-11, <u>quoting</u> <u>LaRouche</u>, 20 F.3d at 71.  In fact, "[t]he focus of the inquiry rests upon the 'material alteration of the legal relationship of the parties.'" <u>Id.</u>, <u>quoting</u> <u>Farrar</u>, 506 U.S. at 111; <u>see</u> <u>also</u> <u>LeBlanc-Sternberg v. Fletcher, et al.</u>, 143 F.3d 748, 757 (2d Cir. 1998).

Here, although plaintiff prevailed only on his retaliation claim, he is the prevailing party for the purpose of awarding attorneys' fees precisely because of the material change that his success effected in the relationship between the parties.  Accordingly, the Court will now proceed to consider the appropriate amount of fees to award.

B.      Reasonable Attorneys' Fees

In the Second Circuit, the lodestar method, in which the amount of time reasonably spent by counsel on the case is multiplied by a reasonable hourly rate, has generally been employed to calculate reasonable attorneys' fees for the prevailing claimant.  <u>See</u> <u>Cruz v. Local Union No. 3 of the Int'l. Bhd. of Elec. Workers</u>, 34 F.3d 1148, 1159 (2d Cir. 1994); <u>Gierlinger v. Gleason</u>, 160 F.3d 858, 876 (2d Cir. 1998); <u>Grant v. Martinez</u>, 973 F.2d 96, 101 (2d Cir. 1992) ("there is a 'strong presumption' that the lodestar figure represents the reasonable fee").  A reasonable hourly rate must be in

14

line with the rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." <u>Cruz</u>, 34 F.3d at 1159; <u>Gierlinger</u>, 160 F.3d at 882.  Additionally, the amount of time expended must be adequately supported by contemporaneous time records that specify relevant dates, time spent, and work done.  <u>New York Ass'n for Retarded Children v. Carey</u>, 711 F.2d 1136, 1148 (2d Cir. 1983).  "[The p]laintiff has the burden of proving the reasonableness of the requested hourly rate."  <u>Sowemimo v. D.A.O.R. Security, Inc.</u>, 2000 WL 890229, at *3 (S.D.N.Y. Jun. 30, 2000).

In its determination of a fee award, the Court may also consider the following factors in adjusting the lodestar figure: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount of work involved and the results obtained; (9) the experience, reputation and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 430 n. 3 (1983).  Ideally, the plaintiff also submits to the Court,

> affidavits from attorneys with similar qualifications stating the precise fees they have received for comparable work or stating the affiant's personal knowledge of specific rates charged by other lawyers [in] similar litigation, data about fees awarded in anomalous cases and evidence of the fee applicant's rates during the relevant time period.

<u>Bridges</u>, 1996 WL 47304, at *11 (internal citations and quotations omitted).

In some cases, the lodestar figure may be subject to an upward or downward

departure. See Grant, 973 F.2d at 101; Hensley, 461 U.S. at 434. "[This] determination lies largely within the discretion of the district court." Grant, 973 F.2d at 101. Such a departure depends upon "whether the plaintiff's unsuccessful claims were related to those on which she prevailed," and "'whether the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award[].'" Knoeffler, 126 F. Supp.2d at 318, quoting Hensley, 461 U.S. at 434.

### 1.    Reasonable Hourly Rate

Here, plaintiff's counsel request hourly rates of $350 for Mr. Goodstein and $300 for Ms. Kelly. See 10/26/04 Aff. of Robert David Goodstein ("October Goodstein Affirmation"), ¶ 24; 10/26/04 Aff. of Paula Johnson Kelly ("October Kelly Affirmation"), ¶ 11. Defendant argues that counsel's hourly rates are unreasonable. See Deft.'s Memo. of Law in Opp. to Plt.'s Motion for Attorneys' Fees ("Fee Opposition"), at 7. In support of his request, Mr. Goodstein sets forth in his affirmation the length of time he has been practicing – almost thirty years – and his claimed expertise in the field of employment discrimination law. See Goodstein Affirmation, at ¶¶ 4-22. Ms. Kelly also sets forth in her affirmation the length of time that she has been practicing – almost seventeen years – and her claimed expertise in the field of employment discrimination law. See Kelly Affirmation, ¶¶ 3-9.

The Court finds as a threshold matter that the rates requested by plaintiff's counsel should be adjusted. While the Court recognizes the extensive experience of both Mr. Goodstein and Ms Kelly, the Court concludes that neither attorney has justified the hourly rates requested in this attorneys' fee application. Accordingly, the Court,

within its discretion, determines that the reasonable hourly rates in the instant matter shall be $325 for Mr. Goodstein, and $275 for Ms. Kelly.

      2.   <u>Billed Hours</u>

Defendant further argues that counsel engaged in excessive billing, and that many of counsel's billing entries are too vague to accurately determine whether or not the claimed hours were reasonably necessary.  <u>See</u> Fee Opposition, at 8-11.  The documentation supporting the hours expended by plaintiff's counsel on this matter consists of an itemized billing summary using information drawn from contemporaneously-kept records, setting forth counsel's daily time records with the dates, descriptions of the work performed and the hours spent.  <u>See</u> Plt.'s Not. of Motion, Exh. B (Time Records of Mr. Goodstein) & Exh. C (Time Records of Ms. Kelly). These records indicate that in preparation for and during trial, Mr. Goodstein spent 54 hours in legal work, and 7 hours and 20 minutes in travel time.  Ms. Kelly spent 332 hours and 15 minutes in legal work, and 11 hours and 45 minutes in travel time.[2] Plaintiff's counsel also submit supplemental time records for work performed after trial and with respect to post-trial motions.  <u>See</u> 12/9/04 Aff. of Robert Goodstein ("December Goodstein Affirmation"); 12/9/04 Aff. of Paula Johnson Kelly ("December Kelly

_____

[2]  The calculated hours for Mr. Goodstein and Ms. Kelly are corrected calculations.  In plaintiff's papers, Mr. Goodstein requested compensation for 58 hours and 55 minutes of legal work, and 6 hours and 20 minutes of travel time.  Ms. Kelly requested compensation for 380 hours and 5 minutes of legal work, and 10 hours and 45 minutes of travel time.

      In accordance with the standard applied in this jurisdiction, travel time is normally reduced by 50%.  <u>See</u> <u>Wilder v. Bernstein</u>, 975 F. Supp. 276 (S.D.N.Y. 1997); <u>Lilly v. County of Orange</u>, 910 F. Supp. 945 (S.D.N.Y. 1996); <u>Luciano v. Olsten Corp.</u>, 925 F. Supp. 956 (E.D.N.Y. 1996).  In plaintiff's reply memorandum, counsel included an Addendum in which they separately billed travel time at 50% of their hourly rates, at $175 an hour for Mr. Goodstein and $150 an hour for Ms. Kelly.  <u>See</u> Plt.'s Memo. of Law in Reply, at Addendum.

Affirmation"). These records indicate that after trial, Mr. Goodstein spent 10 hours and 25 minutes in legal work, and Ms. Kelly spent 32 hours and 35 minutes in legal work.

While some of the individual entries in counsel's records appear wanting in some specificity and detail, the Court finds that such entries, when considered in the context of the entire billing summary, clearly establish the subject matter of the work performed by counsel. See generally, Bridges v. Eastman Kodak, 1996 WL 47304, at *4 (S.D.N.Y. Feb. 6, 1996) (declining to reduce lodestar amount notwithstanding occasional vague descriptions of work, as the records, overall, indicated reasonableness of each task and time expended).

As to the amount of time expended by plaintiff's counsel, this Court is not inclined to undertake an *ex post facto* probe into counsel's billing practices, in light of decisions in this jurisdiction admonishing courts from "becom[ing] enmeshed in a meticulous analysis of every detailed facet of the professional representation." Bridges, 1996 WL 47304, at *4, quoting Seigal v. Merrick, 619 F.2d 160, 164 n. 8 (2d Cir. 1980). However, the Court notes that some of defendant's arguments merit attention. In particular, defendant claims that Ms. Kelly should not be awarded attorney's fees for the time she spent in court during trial, because she did not examine any witnesses or present any argument. See Fee Opposition, at 9.

"The Second Circuit has stated that prevailing parties are not barred as a matter of law from receiving fees for the assistance of a second attorney during the course of discovery or court proceedings. See Carey, 711 F.2d at 1146. However, it is reasonable to reduce the fee request when both of the attorneys who participated in the trial seek to be compensated at top 'first seat' rates, and when some of the work was

18

duplicative or unnecessary.  See Williams v. New York City Hous. Auth., 975 F. Supp.

317, 326-27 (S.D.N.Y. 1997)."  Colbert v. Furumoto Realty, Inc., 144 F. Supp.2d 251,

264 (S.D.N.Y. 2001).  It is within the trial court's discretion to determine whether or not

the actual time expended by an attorney is reasonable.  See Luciano v. Olsten Corp.,

109 F.3d 111, 117 (2d Cir. 1997).  In addition, a court may "exclude excessive and

unreasonable hours from its fee computation by making an across-the-board reduction

in the amount of hours."  Id.; see also In re "Agent Orange" Prod. Liab. Litig., 818 F.2d

226, 237-38 (2d Cir. 1987).

In the instant matter, Ms. Kelly neither questioned witnesses nor presented

argument to the Court.  Mr. Goodstein, with almost thirty years of experience litigating

state and federal discrimination claims, was fully capable of handling the trial of this non-

complex matter with minimal assistance.  See Colbert, 144 F. Supp.2d at 264.

Accordingly, the Court concludes that Ms. Kelly's forty-three hours spent in court for the

duration of the trial should be reduced by 50%.  See Luciano, 109 F.3d at 117 (affirming

a 50% reduction of  attorney's hours spent at all stages of trial because he questioned

only one minor witness and did not otherwise participate meaningfully); cf. Anderson v.

YARP Restaurant, Inc., 1997 WL 47785, at *4 (S.D.N.Y. Feb. 6, 1997) (allowing attorney

fee awards to both trial counsel where both attorneys "participated actively at trial from

its commencement through verdict").

Finally, the Court, being intimately familiar with the contours of the instant matter,

notes that the case at bar involved straightforward Title VII claims that raised no novel or

complex issues of fact or law.  See Carey, 711 F.2d at 1146 (a court must make an

"assessment of what is appropriate for the scope and complexity of the particular

litigation."); <u>Mason Tenders District Council Welfare Fund v. Mackroyce Construction Corp.</u>, 1998 WL 193075, at *2 (S.D.N.Y. Apr. 22, 1998); <u>Amato v. City of Saratoga Springs</u>, 991 F. Supp. 62, 66 (N.D.N.Y. 1998); <u>Berry v. NYS Dept. of Corr. Servs.</u>, 947 F. Supp. 647, 651 (W.D.N.Y. 1996). Accordingly, the Court finds that the hours billed by counsel possessing the claimed experience and expertise are excessive, and will reduce the overall fee and costs award by twenty percent (20%).

### 3. <u>Administrative Tasks</u>

Defendant also contends that Ms. Kelly should not be permitted to charge her normal hourly rate for clerical tasks, such as mailing and faxing, ordering transcripts, preparing exhibits, preparing a table of authorities, setting up the case file and drafting subpoenas. <u>See</u> Fee Opposition, at 9-10. The Court agrees and finds that some of the tasks charged in plaintiff's fee application should be billed at a lower rate, such as that appropriate for clerical, secretarial or paralegal services. Other courts in this Circuit have recognized that tasks such as filing, service of papers, mailing, and file organization are not a generally compensable portion of attorneys' fees. <u>See</u> <u>Marisol A. ex rel. Forbes</u>, 111 F. Supp.2d 381; <u>Pascuiti v. New York Yankees</u>, 108 F. Supp.2d 258 (S.D.N.Y. 2000); <u>Luciano v. Olsten Corp.</u>, 925 F. Supp. 956 (E.D.N.Y. 1996). Even if an attorney completes some clerical or non-legal tasks him- or herself, compensation should be set at a lower hourly rate than that usually attributed to the attorney. <u>See</u> <u>Luciano</u>, 925 F. Supp. at 966.

Here, although plaintiff's counsel make no mention of work performed by paralegals or secretaries, the Court finds it appropriate to reduce the hourly rate for most

of the non-legal services performed by Ms. Kelly below, from her requested rate of $300 an hour to a standard paralegal rate of $75 an hour.  See Marisol A. ex rel. Forbes, 111 F. Supp.2d at 388 (finding that prevailing market rate for paralegal services is in the $60-$75 range); Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp.2d 417, 424-25 (S.D.N.Y. 1999) (stating the standard hourly rate for paralegals is $65-$80).

| Date | Task | Time Spent |
|------|------|-----------|
| 12/05/01 | "Set-up/review file; follow up on service" | 1.00 hrs |
| 01/28/02 | "Received response - J. McMahon; forward to defendant's attorney" | .15 mins |
| 07/18/02 | "Fax Stipulation of Confidentiality to Bromberg" | .05 mins |
| 07/29/02 | "Fax draft of JPTO to Bromberg; draft letter to plaintiff" | 2 hrs. 15 mins.[3] |
| 08/09/02 | "Review faxed Order; do jury charges & voir dire and deliver to Court" | 13 hrs. 30 mins.[4] |
| 08/14/02 | "Ordered copy of transcript" | .05 mins. |
| 02/06/04 | "Final edit w/table of authorities, copies; original & courtesy copy to Court; tele. call from Bromberg re: subpoenas" | 2 hrs. 50 mins.[5] |

Total Hours Reduced to Paralegal Hourly Rate ($75/hr):        17 hrs. 45 mins.

---

[3]  The Court reduces  this billing entry by 15 minutes to account for the faxing task that could have been performed by non-legal personnel.

[4]  The Court reduces  this billing entry by 1 hour to account for the fact that non-legal personnel could have delivered plaintiff's jury charges and *voir dire* to the Court.

[5]  The Court reduces this billing entry by 1 hour to account for the fact that non-legal personnel could have delivered the original and courtesy copies to the Court.

C.     Costs

Plaintiff's counsel also seek to recover costs incurred in the course of this lawsuit. "It is well-settled that 'attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients.'" Marisol A. ex rel. Forbes, 111 F. Supp.2d at 401, quoting LeBlanc-Sternberg, 143 F.3d at 763(internal quotations omitted).  Out-of-pocket costs that are normally charged to clients are generally compensable under Section 1988.  See Rodriguez, 84 F. Supp.2d at 426. Here, plaintiff requests reimbursement for costs which include filing and witness service fees, transcript costs and delivery costs.  See Plt.'s Memo. of Law in Reply, Exhibit.  This Court will allow the recovery of these costs in the amount of $3,297.24, as these costs are generally recognized in this circuit as compensable.  See generally, Gidatex v. Campaniello Imports, Ltd., 82 F. Supp.2d 136, 150 (S.D.N.Y. 2000); Funk v. F&K Supply Inc., 43 F. Supp.2d 205 (N.D.N.Y. 1999).  Given the Court's familiarity with this matter, it is satisfied that the expenses listed by plaintiff's counsel were reasonably incurred during the course of this lawsuit.


**CONCLUSION**

Defendant's motions for judgment as a matter of law, or in the alternative, a new trial, are denied.  The $100,000 punitive damages award is set aside.  Plaintiff is awarded attorneys' fees and costs as follows:

22

1. Non-Travel Related Attorneys' Fees:

| Attorney | Hourly Rate | x | Time Expended[6] | = | Total |
|----------|-------------|---|------------------|---|-------|
| R. Goodstein | $ 325.00 | | 64 hrs, 25 mins | | $ 20,935.50 |
| P.J. Kelly | $ 275.00 | | 325 hrs, 35 mins[7] | | $ 89,535.42 |
| "Paralegal" | $ 75.00 | | 17 hrs, 45 mins | | $ 1,331.25 |

2. Travel Related Attorneys' Fees:

| Attorney | Hourly Rate | x | Time Expended | = | Total |
|----------|-------------|---|---------------|---|-------|
| R. Goodstein | $ 175.00 | | 7 hrs, 20 mins | | $ 1,282.75 |
| P.J. Kelly | $ 150.00 | | 11 hrs, 45 mins | | $ 1,762.50 |

3. Costs = $3,297.24

4. Subtotal (fees and costs) = $118,144.66

5. Percentage reduction of overall award = 20%

6. **Total Fees and Costs** = $94,515.73

The Clerk of the Court shall enter an amended judgment accordingly.

SO ORDERED.

---

[6] Counsel's total expended hours as corrected on p. 17, supra.

[7] Ms. Kelly's total expended 364 hours and 50 minutes, minus the 17 hours and 45 minutes to be billed at paralegal rates listed on p. 20-21, supra, and minus the 21.5 hours of trial time (half of the billed 43 hours of trial time) as calculated on p. 19, supra.

Dated:    April 27th, 2005
          White Plains, New York

 

_____

GEORGE A. YANTHIS

UNITED STATES MAGISTRATE JUDGE

Copies of this Decision & Order have been sent to the following:

Robert Goodstein, Esq.

Todd Bromberg, Esq.

David Warner, Esq.